### THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NATASHA WALKOWICZ SHEA ::::

                **Plaintiff,**    :    **3:23-CV-814**
                                 :    **(JUDGE MARIANI)**

        **v.**              :

**KALAHARI RESORTS &**    :
**CONVENTIONS - POCONOS, and**    :
**KALAHARI RESORTS PA, LLC, and**    :
**KALAHARI RESORTS, LLC**    :
                                 :
          **Defendants.**    :

FILED
SCRANTON

SEP 2 2 2025

PER _____
DEPUTY CLERK

### MEMORANDUM OPINION

### I.      INTRODUCTION & PROCEDURAL HISTORY

This is a premises liability action in which the Plaintiff Natasha Walkowicz Shea ("Plaintiff") seeks to hold the Defendants liable in negligence for her alleged injuries sustained as a result of slipping and falling on snow and/or ice in a parking lot owned by the Defendants. Before the Court are two motions filed by Defendants Kalahari Resorts & Conventions – Poconos, Kalahari Resorts PA, LLC and Kalahari Resorts, LLC (together, "Defendants" or "Kalahari"). In the first motion, Kalahari moves in limine seeking to preclude the testimony and report of Plaintiff's engineering expert Keith A. Bergman, P.E. (Doc. 22). In the second motion, Kalahari moves for summary judgment. (Doc. 24). For the reasons set forth below, the motion in limine will be denied without prejudice and the motion for summary judgment will be denied.

On May 18, 2023, Plaintiff filed a Complaint against the Defendants. (Doc. 1). In the Complaint, Plaintiff asserts a single count of negligence against the Defendants alleging injuries and seeking damages based on a slip and fall accident in Defendants' parking lot following a snowstorm and ice accumulation. (Id.). After several extensions of time to complete discovery, (Docs. 18, 20), Defendants filed their motion in limine and motion for summary judgment on or about March 20, 2025. (Docs. 22, 24). The matter has been fully briefed and ripe for disposition.[1]

## II.     STATEMENT OF MATERIAL FACTS

### A. Defendants' Statement of Undisputed Material Facts

Defendants have filed a Statement of Material Facts, which the Court will refer to as "DSOMF." (Doc. 24-1). Although Plaintiff filed a Response in Opposition to Defendants' motion for summary judgment, (Doc. 28 at 2-15), where she appears to deny many of the statements contained in the numbered paragraphs of Defendants' motion itself, Plaintiff did not file any response to DSOMF as required by Local Rule 56.1. Pursuant to Middle District of Pennsylvania Local Rules, "[a] brief in opposition to a motion for summary judgment and LR 56.1 responsive statement, together with any transcripts, affidavits or other relevant documentation, shall be filed within twenty-one (21) days after service of the movant's brief." M.D. Pa. L.R. 7.6. Plaintiff failed to respond to DSOMF, and only responded to the

---

[1]     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the parties are diverse and the amount in controversy exceeds $75,000.

numbered paragraphs in Defendants' motion itself. *Compare* (Doc. 24-1), *with* (Doc. 28 at

2-15). Accordingly, under Local Rule 56.1, by failing to file a response to DSOMF, Plaintiff

is deemed to have admitted each of DSOMF. *See Rau v. Allstate Fire & Cas. Ins. Co.*, 793

Fed. App'x 84, 87 (3d Cir. 2019) ("Because a failure to object to a statement of facts is an

admission under Local Rule 56.1, and the District Court has authority to impose sanctions

for noncompliance with the local rules, we find no abuse of discretion in the decision to

deem certain paragraphs of Allstate's SUF admitted.").[2] Therefore, the Court will deem

Paragraphs 1-17 of DSOMF as admitted. It will not deem paragraphs 18-22 of DSOMF as

admitted because these paragraphs are conclusions of law. Instead, the Court will review

all record evidence submitted by the parties.

The following facts are undisputed:

On March 10 and March 11, 2023, Kalahari experienced a winter storm in which

precipitation continued until 3:24 p.m. on March 11, 2023, when the air temperature was 27

degrees Fahrenheit. (DSOMF, ¶ 1). The storm dumped a total of between 5.0 and 6.0

inches of new snow at Kalahari by 9:00 p.m. on March 11, 2023. (*Id.*, ¶ 2). Air

temperatures at Kalahari on March 11, 2023, remained sub-freezing after 11:15 a.m. (*Id.*, ¶

3).

---

[2]    In addition, the Court's Scheduling Order, (Doc. 15, ¶ 4 n.1), specifically requires compliance with Local Rule 56.1.

As to the morning March 11, 2023, Plaintiff testified that "there was pretty much slush and snow everywhere." (*Id.*, ¶ 4) (citing Dep. Tr. of Natasha Walkowicz Shea, Doc. 24-3, Ex. B, 17:24-25). When Plaintiff arrived at Kalahari sometime during daylight hours on March 11, 2023, the parking lots were covered with slushy snow. (*Id.*, ¶ 5). Plaintiff testified that "You just had to be careful where you stepped." (*Id.*, ¶ 6). The Plaintiff left Kalahari around 9:00 p.m. (*Id.*, ¶ 7). By that time, everything seemed to have melted, but there were patches of snow here and there in the parking lot. (*Id.*, ¶ 8). Plaintiff did not see any ice. (*Id.*, ¶ 9). Plaintiff was able to see in front of her as she was walking on the parking lot. (*Id.*, ¶ 10). While walking toward her car, Plaintiff slid and fell. (*Id.*, ¶ 11). After Plaintiff fell, she stood up, walked to her car, and drove to pick up her daughter at the entrance. (*Id.*, ¶ 12). Plaintiff left Kalahari without speaking to any Kalahari personnel about her fall. (*Id.*, ¶ 13).

A video produced in discovery depicting the Kalahari parking lot at approximately 9:01 p.m. on March 11, 2023, shows Plaintiff walking across the parking lot. (*Id.*, ¶ 14). The video shows a light-colored SUV in front of and slightly to right of the plaintiff, in front of which is a patch of show. (*Id.*, ¶ 15). The video depicts Plaintiff cutting toward the SUV and snow. (*Id.*, ¶ 16). To the left of the snow, the parking lot was clear. (*Id.*, ¶ 17).

## B. Additional Record Evidence

Although Plaintiff did not respond to DSOMF, she in good faith attempted to, and has further provided the Court with additional record evidence and arguments. This includes, among others, the entire deposition transcript of Plaintiff, an expert report describing the

4

weather of the day before the accident and on the day of the accident, the deposition

transcript of Defendants' Rule 30(b)(6) witness Donald Pleau, Jr., and an engineering report

prepared by Plaintiff's engineering expert Keith A. Bergman, P.E. (Docs. 28-2, 28-3, 28-4,

28-6).

Plaintiff was deposed on September 13, 2024. (Doc. 28-3). Plaintiff is a citizen of

New York State, holds a doctorate degree from New York University in administration and

leadership, and is employed by the Port Jervis City School District as Assistant

Superintendent. (*Id.* at 4:24-8:6). She has been diagnosed with multiple sclerosis,

epilepsy, and had a previous back injury prior to the fall. (*Id.* at 34:13-19). Plaintiff visited

Defendants' location in order to attend a cheerleading event in which her daughter

competed. (*Id.* at 20:1-21:2).

Regarding the weather on March 11, 2023—the day of the accident—the following

exchanges took place during Plaintiff's deposition:

Q: Okay. So let's talk about this day, March 11, 2023. Do you remember what day of the week that was?

A: March 11, 2023, was on a Saturday.

Q: Saturday. Okay. And what was the weather like that day? Do you recall that?

A: Yes, very clearly. It was a melting pot from the night before's snowstorm, so from the beginning of the morning when I woke up and went to get coffee there was—it was starting—it already had started melting, so there was pretty much slush and snow everywhere.

(*Id.* at 17:14-25).

5

Q:  Do you remember when you arrived at that competition?

A:  I don't.

Q:  Do you remember whether it was still daylight or after dark?

A:  It was still daylight.  I know the parking lots weren't in good condition.  There was slush.  Like we tried to get to the sidewalk but the parking lots were a mess, so we had to walk through that.

Q:  All right.  Now, you said that when you arrived there the parking lot was slushy. Did it appear to you that it had been plowed?

A:  No.

Q:  Were you able to determine whether parts of the facility had been plowed?

A:  No.

Q:  It had not been or you—

A:  It had not been.

Q:  Okay.  And at that point then was it above freezing or was it below freezing?

A:  I think it was above freezing because everything was melting, but I can't be certain.

Q:  All right.  So then did you have any difficulty getting from your car to the facility where this competition was occurring due to the snow or the slush?

A:  You just had to be careful when you stepped, that's all I remember, just kind of hopping over things to get there.

Q:  All right.  Now, you don't recall how long you were there, but do you recall when you left, what time that was?

A:  I want to say it was around nine, maybe.

Q:  Okay.

A:  It was dark.

Q:  All right.  So then at the time this accident happened, you were going to pick up the car?

A:  Yes.

Q:  And at the time you left, what was the condition of the—of the parking lot in terms of snow or ice?

A:  By then everything seemed to have melted.  I do know the temperature was warmer that day, because things looked like they were melting rapidly, so it seemed pretty clear.  There may have been patches of snow here and there yet, but it was—it was dark in the parking lot.  The lighting was not great, so I just went to the car and tried to walk as carefully as possible.  You know, it looked pretty clear, though.

Q:  Okay.  Were you able to tell whether there had actually been plowing or salting?

A:  No, I couldn't tell.

(*Id.* at 21:12-25:3).

Plaintiff also engaged in the following exchanges during her deposition regarding the conditions of the parking lot at the time of her accident:

Q:  All right.  As you were walking on the parking lot were you able to see any areas of ice or snow?

A:  I believe there was still some snow.  I didn't see ice.

Q:  Okay.  And where—generally where was the snow?

A:  Off on the sides, like—I don't really remember.  I just—off to the left of me I remember there was some snow, like just small patches—not

Q: As you're—as you're walking towards your car, where were you looking?  Do you remember?  Were you looking down?  Were you looking straight ahead?

7

A: I was looking at the car. I may have been looking down at—you know, like between the two, just to find the car and then—

Q: Were you able to see the walkway in front of you as you were walking?

A: The sidewalk, the blacktop, or—

Q: Well, the sidewalk—

A: --anywhere?

Q:--blacktop, whatever you were walking on, were you able to see in front of you as you were walking forward?

A: Yeah. I was trying to be cautious because it was very dark to see anyway, the lighting, like I said, was not bright like a Walmart parking lot would be, but, yeah, I did navigate to the car.

Q: Were you able to see that there was any snow or ice in front of you that you were headed toward as you were walking to your car?

A: No, mm-mm.

Q: All right. Why don't you describe then what happened to lead to your fall.

A: I was walking towards my car, and I slid and fell, and when I fell, I realized I had urinated on myself after I fell or when I fell in the process. I remember being on my hands and knees and searching for salt or sand just to get a grip, because it was very slippery, and I couldn't feel any sand or salt. I did call out for help. I heard voices in the distance. I did call for help verbally, and then when I realized that I probably was there by myself, I backed up to try to get to the edge of the ice where— so I could try to get up, because I couldn't get upon the ice, so I did back up, like back up, like crawl back to get up, and then from there, I went to my car.

Q: How long do you think you were down on the—on the lot?

A: I don't know.

Q: Minutes, seconds?

A: It felt like forever, I'll be honest.  I was kind of in shock, so I really can't recall the time, but it felt like a long time.

Q: Okay.  And then as you were lying there, did you—did you feel as though you had injured yourself?

A: Yes.

Q: What did you feel was injured?

A: My back for sure.  That was the most part.  It was radiating down my leg, so it was hard to get up on my left leg.  I had to rely on my right leg to get up.

(*Id.* at 26:4-28:23).

When Plaintiff was shown the surveillance video depicting the accident, the following

exchanges took place:

Q: Okay.  Do you remember seeing that snowpile there?

A: No.

Q: All right.  Do you remember whether you were looking down?

A: I don't remember if I was looking down or at my car.

Q: Okay.  Do you see that to the left of that particular snowpile it does appear to be cleared, that there's no snow?

A: To the left, yeah.

Q: All right.  And if you had gone a few feet left of that you would have avoided that snow, would you agree with me on that?

A: Yes.

(*Id.* at 38:24-39:14).

Q: All right.  And that—what we just saw there, is that the moment that you fell?

9

A: Yes.

Q: And it looks like the place where you fell was right in the vicinity of that snowpile. Would you agree with that?

A: Yeah, right before it, it looks on the video.

Q: Now, it looked to me like it really took some seconds for you get from a fallen position to standing and walking to your car. Would you agree with me on that?

A: Yeah.

(*Id.* at 41:1-42:2).

Plaintiff did not seek any treatment on the evening of her fall but testified that the next day her back was in pain, she couldn't get out of bed and was crying. (*Id.* at 29:20-30:5). The day after her accident, on March 12, 2023, Plaintiff spoke to an employee of Defendants about the accident, was able to drive home with her daughter, and then she proceeded to go the emergency room. (*Id.* at 45:4-46:16). Plaintiff was evaluated at the emergency room, took a CT scan, and was prescribed pain medications and told to see her back doctor the following day. (*Id.* at 46:18-47:23). Plaintiff saw her back doctor—Dr. Prvulovic—the following day on March 13, 2023. (*Id.* at 47:24-48:14). She was then referred to an orthopedic surgeon—Dr. Wells-Roth. (*Id.* at 48:15-49:9). After the accident, Plaintiff was wearing a back brace, working from home, and required back surgery. (*Id.* at 12:21-15:19).

Plaintiff had back surgery on March 16, 2023—about five days after the accident. (*Id.* at 50:15-17). However, Plaintiff had a MRI examination on her lower back on March 9,

2023—just days prior to the accident—and had been involved in a car accident in March of 2022 for which she received certain steroid injections. (*Id.* at 50:21-52:2; 57:1-59:1). Plaintiff's back surgery was a discectomy—where three parts of her discs were removed. (*Id.* at 52:3-52:15). She was hospitalized from the early morning of March 16, 2023 through the evening of March 18, 2023. (*Id.* at 52:22-53:2). Plaintiff was out of work for at least two weeks following her surgery and worked from home for a period of time following the accident and the surgery. (*Id.* at 53:19-54:16). Plaintiff began physical therapy after the March 16, 2023, surgery and had another back surgery on June 7, 2024, because her nerves canals were blocked, and there were bone fragments, spinal fluid, and scar tissue that the doctor needed to remove. (*Id.* at 64:6-65:16).

Plaintiff has been on certain restrictions after her accidents and surgeries. She is not supposed to bend, lift more than 10 pounds, or twist. (*Id.* at 69:17-70:1). She is unable to participate in her prior activities, including Karate, swimming, running, biking, hiking, and triathlons. (*Id.* at 69:25-71:15). She is also unable to lift weights and testified that the pain medications she has been on following the accident put her in a fog. (*Id.* at 71:16-72:14).

Plaintiff also has submitted an expert report from John R. Scala, PHD CCM, detailing the weather on the day of the accident and the day before the accident. (Doc. 28-2). Dr. Scala based his opinions in his report on "the relevant metrological observations, surface weather analysis, Doppler radar data, and National Weather Service statements." (*Id.* at 1). Defendants do not move to preclude the report of Dr. Scala.

Dr. Scala opined on the weather conditions and reached the following conclusions:

- A residual snow/ice cover of approximately 1.5 inches was present on level, untreated and unmodified exposed surfaces within three miles of the Kalahari Resorts property on the morning of March 10, 2023 and prior to the arrival of a winter storm. (*Id.* at 5).

- Light and intermittent snow was first observed at nearby Pocono Mountains Municipal Airport between 12:35 p.m. and 12:50 p.m. on March 10, 2023 accompanied by an air temperature of 32 degrees Fahrenheit. (*Id.* at 6).

- Steady snow arrived at Pocono Mountains Municipal Airport at 1:55 p.m. with an air temperature of 33 degrees Fahrenheit. The snow continued through the afternoon and into the evening, becoming moderate to heavy in intensity between 4:51 p.m. and 5:36 p.m. with an air temperature of 30 degrees Fahrenheit. Light and at time intermittent snow continued through the overnight hours into the morning of March 11, 2023 accompanied by an air temperature between 30 degrees Fahrenheit and 32 degrees Fahrenheit. (*Id.*).

- The light snow mixed briefly with an unknown precipitation type at Pocono Mountains Municipal Airport ending at 10:39 a.m. on March 11, 2023 accompanied by an air temperature of 30 degrees Fahrenheit. An additional period of unknown precipitation occurred between 10:39 a.m. and 10:45 a.m., and again between 11:18 a.m. and 3:24 p.m. when the precipitation ended accompanied by an air temperature of 27 degrees Fahrenheit. (*Id.*).

- The winter storm of March 10-11, 2023 produced 5.0 to 6.0 inches of new snow at the Kalahari Resorts property on Pocono Manor leading to a residual snow/ice cover of approximately 6.5 inches at 9:00 p.m. on March 11, 2023. (*Id.*).

- KPASCOTR4, the private weather station in Pocono Manor observed a minimum air temperature of 25.1 degrees Fahrenheit at 5:45 a.m. and a daily maximum of 34.8 degrees Fahrenheit at 12:00 p.m. on March 10, 2023 prior to the onset of light snow. (*Id.*).

- KPASCOTR4 observed sub-freezing air temperatures again at 5:00 p.m. on March 10, 2023 during the height of the storm; the air temperature remained below 32 degrees Fahrenheit until 8:15 a.m. on March 11, 2023. A daily

maximum air temperature of 32.7 degrees Fahrenheit was observed at 11:15 a.m. followed by sub-freezing temperatures through the remainder of the day as colder air arrived on the backside of the departing winter storm. KPASCOTR4 reported an air temperature of 26.4 degrees Fahrenheit at 9:00 p.m.

- A Winter Storm Warning was in effect for Monroe County from 1:00 p.m. on March 10, 2023 through 10:00 a.m. on March 11, 2023 for heavy snow accumulating initially 4-8 inches. The warning was cancelled and replaced with a Winter Weather Advisory at 3:16 a.m. valid until 10:00 a.m. on March 11, 2023 for an additional 2 to 3 inches of accumulation. The Winter Weather Advisory expired at 10:00 a.m. on March 11, 2023, or approximately 11 hours prior to Ms. Shea's slip and fall. Light precipitation in the form of snow or unknown precipitation type continued at nearby Pocono Mountain Municipal Airport until 3:24 p.m. (*Id.*).

Plaintiff also submitted the deposition testimony of Defendants' Rule 30(b)(6) witness Donald Pleau, Jr. (Doc. 28-4). Mr. Pleau is the Resort General Manager of Kalahari Resorts, Pocono Mountains and has been in that position since March of 2023. (*Id.* at 5:22-6:8). Mr. Pleau testified that it is Defendants practice to maintain snow logs and to conduct property inspection. (*Id.* at 7:23-8:11). He further testified that, although he was aware that surveillance video captured Plaintiff's fall, he did not know whether Defendants had any footage of any plowing, salting, or shoveling the parking lot on the day of the accident. (*Id.* at 11:12-12:4). Kalahari utilizes both employees and independent contractors to perform snow removal activities, depending on the severity of the snowstorm. (*Id.* at 12:11-19).

Mr. Pleau also testified about a "snow log," whereby employees at Kalahari would document snow removal efforts. (*Id.* at 12:20-13:3). Regarding the snow removal logs on the day of the accident, the following exchange occurred:

Q:  All right.  I'm just going back.  You mentioned a Ben Gil as the person who last maintained or cleaned the location of the alleged accident.  Is Ben Gil still employed by Kalahari?

A:  Yes.

Q:  Okay.  And he was a Kalahari employee as of March of 2023?

A:  Yes.

Q:  Have you or anybody else from Kalahari had any conversations with Mr. Gil as to what exactly he did when, as you say, he performed winter maintenance on the parking lot?

A:  I did not.

Q:  All right.  Do you know sitting here today what exactly Mr. Gil did when he performed winter maintenance on the parking lot?

A:  Exactly, no.

Q:  Okay. Do you—do you—sitting here today, do you know what the weather conditions were like on 3/11/2023 or the day before?

A:  No.

Q:  Okay.  Have you reviewed any weather records in preparation to testify today?

A:  No.

Q:  Is there anything at all that sticks out in your mind about the weather or those two days, March 10th and March 11th of 2023?

A:  No.

(*Id.* at 13:17-14:19).

Mr. Pleau further testified regarding the snow logs and his determination that Ben Gil was the last person to do any winter maintenance on the parking lot in which Plaintiff slipped and fell:

Q: All right. Now, there's three items that somebody could do. Do you expect when somebody does this work that they check off or x out or initial anything that says under shoveled, salted, or plowed to show what specifically they did?

A: It depends on the circumstances.

Q: All right. Because looking here it only says Ben Gil—it indicates description of work. Do you know if this was filled out by Ben Gil?

A: I don't know.

Q: All right. So you don't know whose handwriting this is?

A: I do not know.

Q: All right. Do you have any knowledge whether Ben Gil did anything to shovel that day?

A: I have no knowledge.

Q: Do you have any knowledge as to whether Ben Gil did anything to salt that day?

A: No.

Q: Do you know at what period of time—you know, it indicates time 7:30. Does that refer to the time he finished or the time he started?

A: I'm believing that's a 7:30 to 5:30 a.m. is overnight shift.

Q: Okay. So that's his shift? So you believe he was working the 7:30 to 5:30 a.m. shift?

A: Right.

Q: Do you know—can you estimate for me—or, you know, I just to want to—you know, let me know if you have any idea. Do you know at what time Ben Gil plowed or did any snow removal at the particular lot where Natasha Shea fell?

A: No.

(*Id.* at 19:10-20:17).

The following exchange also took place at Mr. Pleau's deposition:

Q: Are you able to give me an estimate in that day as to what time—as to what time Ben Gil plowed the parking lot that Natasha Shea fell in?

A: I am not.

Q: All right. Do you know if this 5:30 or 8:30 a.m. refers to earlier in the day than this or is that referring to the next day on March 12th?

A: I'm not sure.

Q: Okay. Once you or anybody else determined that Ben Gil was likely the last person to do any maintenance work, maintenance or snow removal on that lot, did you get any written or recorded statements from him?

A: Not that I'm aware of.

Q: Do you have any—did you speak to him or have anybody on your behalf speak to him at all about this incident?

A: No.

Q: Do you know what type of machinery Ben Gil used to plow?

A: Specifically, no.

Q: Does he work with a partner or does he work alone when he plows?

A: It depends on the assignments.

Q: All right. That day do you have any idea whether he was assigned a partner?

A: I don't.

(*Id.* at 21:23-23:3).

Mr. Pleau further testified that there were no signs, barriers, or anything else near the scene of the fall that warned of the conditions on the ground. (*Id.* at 26:16-20). He was unaware whether it was above or below freezing at the time of Plaintiff's fall and was also unaware when the last time any precipitation fell prior to Plaintiff's fall. (*Id.* at 28:8-14). With regards to the lighting in the parking lot, the following exchange took place:

> Q: The other thing I want to ask you on the video, because this did occur at night, where is the closest streetlight or artificial lighting from Natasha Shea at the time she fell? Is it this—is it this pole we see here? Is it the Kalahari Convention Center entrance? Where is the closest lighting to Natasha Shea at the time she fell?
>
> A: I'm not sure.
>
> Q: Are you able to tell me in this specific parking lot in front of the convention center the locations where the supplement lighting is located?
>
> A: Can you ask that question again, please?
>
> Q: Do you know the locations of where the supplemental lighting is located in this particular parking lot?
>
> A: No.
>
> Q: Are you able to tell from this video—and I know you might not have firsthand knowledge, but are you able to tell from this video whether or not this—whether or not this lot had been recently salted?
>
> A: No.

(*Id.* at 28:15-29:11). The following exchange also took during Mr. Pleau's deposition:

Q:  Did any outside contractors do any snow or ice removal on either March 10th or March 11th of 2023?

A:  I'm not sure.

Q:  Does Kalahari Resorts own—do they own their own snowplows?

A:  Yes.

Q:  How many do they own?

A:  We own—right now we own three trucks that we put plows on, and we have a tractor that we use for a plow.

Q:  The same in March of 2023?

A:  I'm not a hundred percent sure if it was the same in March of '23.

Q:  Okay.  After Ben Gil did any potential plowing of the lot, did anybody else go out to inspect his work?

A:  I'm unaware.

Q:  The plow that Ben Gil used, did it also—did it also spray any salt or not?

A:  Perhaps.

Q:  But you can't tell me one way or another as we sit here today?

A:  I can't tell you one way or another.

Q:  Okay.  Now, there seems to be an indication from reviewing the records of the—you know—records sent to me that while you believe Ben Gil plowed, there were portions of the lot that couldn't be plowed because cars were parked there; is that right?

A:  You can't plow a spot where there's a vehicle parked.

Q: I understand. So is that—is that your contention that, you know, while Ben Gil plowed, there's certain areas that couldn't have been plowed because of the existence of some cars there?

A: Yes.

Q: All right. Did Ben Gil returned a second or third time to continue doing plowing at the lot in case some of the cars had moved?

A: Specifically, I can't answer that.

Q: Okay. I'm going to show you that video again where Natasha Shea goes down somewhere in the middle of this frame. Do you have any knowledge as to how long it had been since a car had been parked in that location where she fell?

A: No.

Q: Do you know if a car was parked in that location when Ben Gil plowed?

A: No.

Q: Okay. You said sometimes—Kalahari sometimes employs outside contractors. Is there any kind of snow removal contract that was applicable as of March 2023?

A: Not that I'm aware of.

Q: Are you aware of anybody else who had any responsibility for plowing this particular lot other than Kalahari or its employees?

A: No.

Q: Okay. Does Kalahari maintain any manuals or handbooks regarding how snow and ice removal is expected to be performed?

A: I'm not aware of any.

Q: Okay. Do employees such as Ben Gil get any particular or get passed out any kind of written pamphlets or written handbooks regarding how they are supposed to perform snow and ice removal?

A: I don't think so.

Q: Do they get any—do people like Ben Gil get any on-the-job training as to how they do snow and ice removal?

A: Yes.

Q: Is there any kind of formal training program on that?

A: I'm unaware.

(*Id.* at 30:24-33:22).

Plaintiff has also submitted an expert report from her engineering expert Keith A. Bergman, P.E. (Doc. 28-6). This report is the subject of Defendants' motion in limine, which will be addressed more fully below. Mr. Bergman report indicates that he examined the incident site and the incident circumstances in order to determine the nature and cause of the accident. (*Id.* at 2). Mr. Bergman reached the following opinions and conclusions:

- The incident parking lot area was not maintained to provide safe walking conditions according to ASTM International Designations F1637-13 (and subsequent editions). (*Id.* at 13).

- Kalahari Resorts failed to comply with the guidelines provided in ANSI/ASCA A1000-2014 *System Requirements for Snow and Ice Management Services* causing the incident to occur. Kalahari knew, or should have known, that the incident asphalt parking lot would be used by pedestrians, like Natasha Shea and should have ensured that incident area was pretreated/salted to prevent slip/trip/fall incidents. The failure of Kalahari Resorts to properly pretreat, treat, monitor, and inspect the incident asphalt parking lot caused this incident to occur. (*Id.* at 15).

- Kalahari Resorts knew, or should have known, that the parking lot slopes towards the inlets from the building which would facilitate drainage flow and have the potential for water freeze/re-freeze conditions with changing temperatures. Kalahari Resorts knew, or should have known, that a snow/ice

condition on the parking lot would create a hazardous walking surface condition and could result in slip/fall incidents. (*Id.* at 16).

- The presence of snow/ice on the walking surface of the parking lot created a hazardous condition and resulted in this incident occurring.  By failing to properly inspect and maintain the parking lot, Kalahari Resorts failed to reasonably comply with the 2015 International Property Maintenance Code and the *Property Maintenance Code of Tobyhanna Township*. The incident parking lot was required to be kept in a "proper state of repair, and maintained free from hazardous conditions" by Kalahari Resorts.   Donald Pleau testified that property inspections were performed of the snow removal.   Donald Pleau testified that he was not certain the lot was plowed on March 11, 2023.  Kalahari Resorts should have provided adequate personnel to maintain the incident parking lot area free of recognized hazardous conditions, such as snow/ice. (*Id.* at 18).

- The presence of snow/ice on the parking lot created an unsafe walking surface for pedestrians, like Natasha Shea, and failed to comply with the *Code of the Township of Tobyhanna*.  As listed above in the report of Dr. John Scala, "The Winter Weather Advisory expired at 10:00 a.m. on March 11, 2023 or approximately 11 hours prior to Ms. Shea's slip and fall."  Sufficient time and opportunity were available for Kalahari Resorts to properly pretreat/salt/clear the parking lot to avoid this incident.   The parking lot should have been inspected and/or pretreated/salted and cleared by Kalahari Resorts to provide safe walking conditions and eliminate the slip/fall hazards.   Had Kalahari Resorts provided reasonable and appropriate inspection of the condition of the incident area, and cleared and/or treated the incident area, this incident would have been avoided. (*Id.* at 18-19).

- The actions/inactions of Natasha Shea did not cause this incident to occur. (*Id.* at 20).

- It was foreseeable that the snow/ice conditions of the parking lot could result in slip/fall incidents for pedestrians, like Natasha Shea. (*Id.* at 21).

- The presence of snow/ice on the sidewalk/footway created an unsafe walking surface for pedestrians, like Natasha Shea, and failed to comply with ASTM International Designation F1637-13 (and subsequent editions), *Standard Practice for Safe Walking Surfaces*, ANSI/ASCA A1000-2014 *Systems Requirements for Snow and Ice Management Services,* <u>International Property</u>

Maintenance Code/2015 Edition and the *Code of the Township of Tobyhanna*. (*Id.*).

- Sufficient time and opportunity were available for Kalahari to clear, pretreat/salt the parking lot area to avoid this incident. (*Id.*).

- The subject incident parking lot area was not maintained to provide safe walking conditions for pedestrians, like Natasha Shea. (*Id.*).

- Had Kalahari Resorts provided reasonable and appropriate inspection of the condition of the incident parking lot area, and cleared and/or treated the incident area, this incident would have been avoided. (*Id.*).

## III.    STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Therefore, the non-moving party may not oppose summary

judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for
summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).  "In considering a motion for

summary judgment, a district court may not make credibility determinations or engage in

any weighing of evidence."  *Anderson*, 477 U.S. at 255.  Therefore, when evidentiary facts

are in dispute, when the credibility of witnesses may be in issue, or when conflicting

evidence must be weighed, a full trial is usually necessary.

## IV.  ANALYSIS

Defendants seek summary judgment dismissing Plaintiff's negligence claim.  (Doc.

24).  They also seek to preclude the report and testimony of Plaintiff's engineering expert

Keith A. Bergman, P.E.  (Doc. 22).

### A.  Defendants' Motion in Limine Will Be Denied Without Prejudice.

Defendants seek to preclude the expert report and testimony of Plaintiff's

engineering expert Keith A. Bergman, P.E.  (Doc. 22).  Specifically, Defendants move "to

preclude plaintiff's engineering expert from testifying as to any opinions regarding liability or

causation pursuant to Fed. R. Evid. 702."  (*Id.* at 1).  Among other things, Defendants state

that "Mr. Bergman's report is remarkable for its complete lack of even a single engineering

opinion."  (*Id.* at 2).  And they further state that "Mr. Bergman simply cannot be permitted to

opine on things outside his engineering bailiwick, and on the ultimate questions of

negligence and causation."  (*Id.* at 10).  "Thus, these opinions do not represent scientific

knowledge (or any kind of technical knowledge) that will assist the trier of fact to understand

or determine a fact in issue as required by *Daubert*." (*Id.*).  Moreover, Defendants claim that "Plaintiff is merely improperly attempting to bolster her negligence claims by having an engineer offer an air authority and legitimize plaintiff's claims by delivering unnecessary, non-engineering opinions about them to the jury." (*Id.* at 11).  Plaintiff opposes Defendants' motion. (Doc. 27).

Federal Rule of Evidence 702, which governs the admissibility of expert witnesses, provides that a witness may be qualified as an expert in a relevant field if:

> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of this case.

Fed. R. Evid. 702.  "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli R.R Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994)).  "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to [Federal Rule of Evidence] 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  Rule 702 has a "liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (internal citation and quotation marks omitted).  Accordingly, the "rejection of expert testimony is the

exception and not the rule." *Dorman Prods. v. PACCAR, Inc.*, 201 F. Supp. 3d 663, 686 (E.D. Pa. 2016).

To qualify as an expert, Rule 702 requires the witness to have "specialized knowledge regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002). The Third Circuit has instructed district courts to interpret the qualification requirement "liberally" and not to insist on a particular kind of degree or background when evaluating the qualifications of an expert. *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998).

*Daubert's* reliability analysis requires a court to consider, among other things: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the methods have been put." *In re Paoli*, 35 F.3d at 742 n.8. "However, *Daubert* did not set out a definitive checklist or test, and no single factor was deemed dispositive." *Mercurio v. Louisville Ladder, Inc.*, 2018 WL 4088059, at *4 (M.D. Pa. Aug. 27, 2018) (citing *Daubert*, 509 U.S. at 593). The inquiry's "overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at

26

594-95. "The focus, of course, must be solely on principles and methodology, not on the conclusion that they generate." *Id.* "[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (citations omitted).

The expert's testimony must also "'fit,' in that it must assist the trier of fact." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000). The *Daubert* standard "is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessment of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Id.* (internal citation and quotation marks omitted).

In this matter, Defendants argue that Plaintiff's engineering expert, lacks the qualification to offer many the opinions set forth in his expert report. In other words, Defendants claim that the opinions offered by Mr. Bergman lack scientific, technical, or other specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue and therefore he is not qualified and his report and testimony does not "fit." Initially, the Court notes that Mr. Bergman has been qualified an expert in

engineering by various Courts.[3]  He is a Consulting Engineer in Civil Engineering and

obtained a bachelor's degree in civil engineering from San Diego State University in 1991.

(Doc. 27-2 at 1).  He purports to specialize in "Highway and Street Design, Traffic

Engineering, Utilities Construction, Storm Drainage, Pedestrian Safety, Walkway Surface

Evaluations, Concrete and Asphalt Pavement Evaluations" and represents that he has

extensive experience "in Construction Management, Project Management, Project Related

Claims, Job Site Safety, Codes and Standards, and ADA Compliance." (*Id.*).  He is a

licensed professional engineer in numerous states throughout the country and represents

that his professional background experience includes "[e]valuations of ice, snow control,

grading, storm water management, detention and retention basins, and soil and

sedimentation control." (*Id.*).

Although the Court agrees with Defendants that many of the opinions offered by Mr.

Bergman may be improper and concern areas outside his engineering expertise, it will not

wholly preclude Mr. Bergman from offering opinions as to either deviation from the standard

---

[3]     *See, e.g., Martin v. Fifth Third Bank*, 2021 WL 2627975, at *2 (S.D. Ind. Mar. 30, 2021) ("A review of Bergman's CV shows that he has thirty years of experience in civil engineering, including site plan design, design and construction of residential and commercial projects, walkway surface evaluations, pedestrian safety, as well as experience in preparing drawings for parking lots and sidewalks.  Any shortcomings or weakness in his methodology or conclusions can be brought out on cross-examination."); *Slappy-Sutton v. Speedway LLC*, 2019 WL 3456843 (E.D. Pa. July 31, 2019) (denying motion to preclude testimony of Keith A. Bergman, P.E.); *Wal-Mart Stores, Inc. v. Chavez*, 2018 WL 3957131, at *5 (Md. Ct. App. Aug. 17, 2018) (noting that the trial court "accepted Mr. Bergman as an expert in the fields of civil engineering, traffic engineering, and pedestrian safety as it pertains to big-box stores.").

of care or causation at this time.[4]  While certain of Mr. Bergman's opinions and conclusions related to snow/ice removal process and his legal conclusions concerning the Defendants' negligence may be improper or inadmissible, Defendants may raise these issues again prior to trial.

Similarly, many of the opinions offered by Mr. Bergman may not satisfy either the "reliability" or "fit" *Daubert* requirements, in that certain of his opinions may not assist the jury in determining a fact in dispute.  Nevertheless, the Court is not inclined to wholly preclude each and every opinion offered by Mr. Bergman, who does in fact offer opinions within his area of engineering expertise.  *See Korn v. Bruce Covey Builders*, 2009 WL 10687119, at *4 (M.D. Pa. Jan. 6, 2009) (denying motion in limine seeking to preclude defendant's engineering expert testimony and report, noting that defendant's arguments "goes to the weight of his testimony, not its admissibility"); *see also Lewars v. EFTEC N. Am., LLC*, 2016 WL 375050, at *9 (E.D. Pa. Jan. 28, 2016) (denying motion for summary

---

[4]    In *Slappy-Sutton v. Speedway LLC*, 2019 WL 8137127 (E.D. Pa. Oct. 10, 2019), Judge DuBois granted in part and denied in part the defendant's motion in limine seeking to preclude the plaintiff's expert Keith Bergman from introducing evidence that Defendant violated building codes, standards, ordinances, or legal conclusions. *Id.* at *1.   Judge DuBois ruled as follows:

"That part of defendant's motion seeking to exclude the testimony of Keith A. Bergman that the curb and area in front of the curb violated relevant codes and industry standards and practices is DENIED." *Id.* "That part of defendant's motion seeking to exclude the testimony of Keith A. Bergman (1) that it was 'foreseeable' that individuals could suffer a serious fall as result of the condition of the curb, (2) that defendant failed to 'reasonably' inspect and maintain the curb, (3) that defendant had 'reasonable notice' of the condition of the curb, (4) that defendant created a 'defective and hazardous' condition and (5) that the condition 'endangered the public' is GRANTED. *Id.*

judgment, noting that "Ronald Cohen, P.E. an engineering expert for Lewars, has opined

that the ice that caused Lewar's falls 'was an artificial presence... caused by leakage from

the T2 Tank Farm that drained onto the truck ramp through a deficient concrete construction

joint").

For example, Mr. Bergman opines that "Kalahari Resorts knew, or should have

known, that the parking lot slopes towards the inlets from the building which would facilitate

drainage flow and have the potential for water freeze/re-freeze conditions with changing

temperature." (Doc. 28-6 at 17); *see also* (*Id.* at 19) ("The presence of snow/ice on the

parking lot created an unsafe walking surface for pedestrians, like Natasha Shea, and failed

to comply with the *Code of the Township of Tobyhanna*."); (*Id.* at 21) ("The presence of

snow/ice on the sidewalk/footway created an unsafe walking surface for pedestrians, like

Natasha Shea, and failed to comply with ASTM International Designation F1637-13 (and

subsequent editions), *Standards Practice for Safe Walking Surfaces*, ANSI/ASCA A1000-

2014 *System Requirements for Snow and Ice Management Services*, International Property

Maintenance Code/2015 Edition and the *Code of the Township of Tobyhanna*.").  While it

may be true that many of the opinions offered by Mr. Bergman are improper or inadmissible,

*see Slappy-Sutton*, 2019 WL 81377127 at *1, the Court will not wholly preclude his report

and testimony at the summary judgment stage.  Accordingly, Defendants' motion in limine

seeking to preclude the testimony and expert report of Mr. Bergman will be denied without

prejudice, subject to renewal prior to trial and a *Daubert* hearing should any party request one.

## B.  Known and Obvious Danger

Defendants first seek summary judgment, arguing that the undisputed evidence shows that, although it owes a duty to protect invitees from foreseeable harm, there can be no liability because Defendants reasonably believed that the alleged dangerous condition would be obvious to, and discovered by, the Plaintiff.  (Doc. 25 at 9-16).  Stated differently, Defendants claim that:

> Here, Plaintiff was well aware it snowed on March 11, 2023.  In addition to her subjective knowledge one must use caution when walking on pavement following wintery precipitation, the dangerousness of ice and snow is obvious.  Despite having a clear path to her vehicle, Plaintiff took a shortcut through a hash-marked no parking area directly into the path of a patch of snow or ice.  Plaintiff has produced no evidence of any other slip-and-fall incidents that or any other day at Kalahari due to ice or snow.  Kalahari should not have anticipated, given a predominantly clear parking lot, an invitee would intentionally and unnecessarily stray from a path of safety directly into a patch of ice of snow.  Accordingly, Kalahari owed no duty to Plaintiff at Kalahari is entitled to summary judgment.

(*Id.* at 16).

The Court, and the parties, agree that Pennsylvania law applies to this diversity action.  "A claim for negligence under Pennsylvania law contains four elements:  (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct for the protection of others against unreasonable risks; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury;

and (4) actual loss or damage resulting in harm to the interests of another." *Northwestern Mut. Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005).

The first negligence element—duty—is at issue in this motion. "The standard of care a possessor of land owes to one who enters upon the land depends upon whether the person entering is a trespasser, licensee, or invitee." *Carrender v. Fitterer*, 503 Pa. 178, 184, 469 A.2d 120 (1983). "Whether a duty exists under a particular set of facts is a question of law." *Petrongola v. Comcast-Spectacor, L.P.*, 789 A.2d 204, 210 (Pa. Super. 2001). However, whether a particular danger is known or obvious is generally a question of fact to be decided by a jury. *See Carrender*, 503 Pa. at 185-86 ("Although the question of whether a danger was known or obvious is usually a question of fact for the jury, the question may be decided by the court where reasonable minds could not differ as to the conclusion.").

The parties and the Court agree that Plaintiff was an invitee as a matter of law, although Defendants do not explicitly concede that Plaintiff was a business invitee. A business invitee "is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Estate of Swift v. Northeastern Hosp. of Philadelphia*, 456 Pa. Super. 330, 335, 690 A.2d 719 (1997). "The duty owed to a business invitee is the highest duty owed to any entrant upon land. The landowner is under an affirmative duty to protect a business visitor not only against

32

known dangers but also against those which might be discovered with reasonable care."

*Emge v. Hagosky*, 712 A.2d 315, 317 (Pa. Super. 1998).

"Possessors of land owe a duty to protect invitees from foreseeable harm."

*Carrender*, 503 Pa. at 185 (citing Restatement (Second) of Torts §§ 341A, 343 & 343A).

With respect to conditions on the land which are known to or discoverable by the possessor,

the possessor is subject to liability only if he,

> (a) Knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitee, and
> (b) Should expect that they will not discover or realize the danger, or will fail to protect themselves against it; and
> (c) Fails to exercise reasonable care to protect them against the danger.

*Id.* (quoting Restatement (Second) of Torts § 343). "It is clear from this section, and the

comments thereto, that liability depends not simply on the status of the injured party (e.g.,

licensee v. invitee), but on many variables.  Major variables include the purpose of the

invitation, the obviousness of the danger, and likelihood that invitee will realize the danger

and will take steps to protect himself, the nature of the land and the purposes of which it is

used." *Atkins v. Urban Redev. Auth. of Pittsburgh*, 489 Pa. 344, 351-52, 414 A.2d 100

(1980). "The location of the accident is the most relevant consideration, because no duty

exists if the invitee knows: (1) the actual conditions; (2) the activities carried on; and (3) the

dangers involved in either." *Campisi v. Acme Mkts., Inc.*, 915 A.2d 117, 120 (Pa. Super.

2006) (citing Restatement (Second) of Torts § 343A cmt. e).

As Section 343A of the Restatement makes clear, "[a] possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge of the obviousness." *Carrender*, 503 Pa. 185; *see also Campisi*, 915 A.2d at 120 ("Restatement Section 343A provides that no liability exists when the dangerous condition is known or obvious to the invitee unless the proprietor should anticipate the harm despite such knowledge."). "A danger is deemed to be 'obvious' when 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment.'" *Carrender*, 503 Pa. at 185 (quoting Restatement (Second) of Torts § 343A, cmt. b). "For a danger to be known, it must not only be known to exist, but . . . also be recognized that it is dangerous and the probability and gravity of the threatened harm must be appreciated." *Id.* (internal citation and quotation marks omitted). "[T]he question of what is a dangerous condition is one of fact which must be answered by the jury." *Finn v. City of Philadelphia*, 541 Pa. 596, 603, 664 A.2d 1342 (1999). Similarly, "the question of whether a danger was known or obvious is usually a question of fact for the jury," although "the question may be decided by the court where reasonable minds could not differ as to the conclusion." *Carrender*, 503 Pa. at 185-86,

"An invitee must demonstrate the proprietor deviated from its duty of reasonable care owed under the circumstances." *Campisi*, 915 A.2d at 119 "Thus, the particular duty owed

to a business invitee must be determined on a case-by-case basis." *Id.* "Neither the mere existence of a harmful condition in a store nor the mere happening of an accident due to such a condition evidences a breach of the proprietor's duty of care or raises a presumption of negligence." *Id.* "Rather, an invitee must present evidence proving that the proprietor deviated from the duty of reasonable care that it owed in the circumstances, *i.e.,* that the proprietor knew or in the exercise of reasonable care should have known of the harmful condition." *Neve v. Insalaco*, 771 A.2d 786, 790-91 (Pa. Super. 2001). "The invitee can satisfy this burden by establishing, *inter alia*, that the proprietor had constructive notice of the harmful condition."[5] *Id.* at 791; *see also Estate of Swift*, 456 Pa. Super. at 336 ("An invitee must prove either the proprietor of the land had a hand in creating the harmful condition, or he had actual or constructive notice of such condition.").

"To establish constructive notice, plaintiff must provide evidence that demonstrates the conditions existed for such a length of time that in the exercise of reasonable care the owner should have known of it." *Snair v. Speedway, LLC*, 2021 WL 168329, at *3 (W.D. Pa. Jan. 19, 2021). "Furthermore, constructive notice may be inferred from weather conditions,

---

[5]     "What constitutes constructive notice must depend on the circumstances of each case, but one of the most important factors to be taken into consideration is the time elapsing between the origin of the defect of hazardous condition and the accident.  The relative durability of the defect comprises a related factor." *Neve*, 771 A.2d at 791. "In sum, to charge a defendant store with constructive notice of a harmful condition a plaintiff need not produce positive testimony as to how long the defect existed if:  (1) the defect is of a type with an inherently sustained duration, as opposed to a transitory spill which could have occurred an instant before the accident; and (2) a witness saw the defect immediately before or after the accident." *Id.*

but only where 'the defendant had knowledge of both the weather condition at the time of the accident and the fact that weather conditions created hazards on the premises." *Id.*

Having review the entire factual record, the Court cannot say that the conditions in Defendants' parking lot were objectively known and obvious as a matter of law.  Nor can the Court say that Defendants lacked any notice (actual or constructive) of the conditions in the parking lot as a matter of law.  Courts applying Pennsylvania law routinely find that whether a particular condition is dangerous, whether that condition is known or obvious, and whether the defendant had actual or constructive notice, should be generally resolved by a jury. *See, e.g., Slappy-Sutton v. Speedway, LLC*, 764 Fed. App'x 271, 273 (3d Cir. 2019) (reversing district court grant of summary judgment, and finding that "[o]n this evidence, both the question of whether the sidewalk's condition was dangerous and whether the condition was open and obvious remain unresolved.  Reasonable minds could differ, as a result, these are questions of fact for the jury."); *Knepp v. Wal-Mart East, L.P.*, 2025 WL 660630, at *2 (W.D. Pa. Feb. 28, 2025) (denying motion for summary judgment, finding "there are material facts in dispute between the parties as to whether the low-lying pallet corner protruding from the watermelon display was a dangerous condition, if it was an open and obvious condition that Knepp should have avoided with the exercise of reasonable care for his own safety, and if Walmart should have anticipated" the accident); *Johnson v. Penney Opco, LLC*, 2025 WL 52007, at *3 (E.D. Pa. Jan. 8, 2025) ("Drawing all inferences in the light most favorable to the non-moving party, reasonable jurors could disagree as to

whether, under the circumstances, the substance on the aisle floor constitute an open and obvious danger."); *Snair*, 2021 WL 168329, *4 ("Here, there is sufficient evidence, viewed in the light most favorable to Plaintiff, for a jury to conclude that the patch of snow and ice existed for such length of time that in the exercise of reasonable care the owner should have known of it."). *Wagner v. H.H. Knoebel Sons, Inc.*, 2016 WL 631594, at *4 (M.D. Pa. Feb. 17, 2016) ("This Court agrees that whether the protruding tree root was an open and obvious condition is an issue of fact for the injury."); *Gindele v. Jamison*, 1987 WL 4527, at *3 (E.D. Pa. Feb. 13, 1987) ("I cannot say on this record that the ice formation was an open and obvious condition as a matter of law.").[6]

---

[6]      *See also Janik v. Zoological Soc'y of Philadelphia*, 336 A.3d 257 (Pa. Super. 2025) (whether particular hazard was open and obvious was jury question); *Robinson v. Seven Springs Mountain Resort, Inc.*, 323 A.3d 202 (Pa. Super. 2024) (unpublished) (same); *Pusateri v. Wal-Mart Stores East, L.P.*, 646 F. Supp. 3d. 650 (W.D. Pa. 2022) (denying motion for summary judgment where issues of fact existed as to whether customer knew of risk or that the risk was obvious to a reasonable person in her position); *Fristic v. Maple Lawn Assoc., Inc.*, 240 A.3d 162, 163 (Pa. Super. 2020) (unpublished) (reversing grant of summary judgment, finding that plaintiffs "have identified material issues of facts such that reasonable minds could differ as to whether or not the subject defect in Maple Lawn's parking lot was open and obvious"); *Garcia v. Treetops, Inc.*, 2016 WL 4493352 (M.D. Pa. Aug. 26, 2016) (denying motion for summary judgment based on open and obvious danger); *Rudnick v. Great Atl. & Pac. Tea Co., Inc.*, 2015 WL 418141, at *2 (E.D. Pa. Feb. 2, 2014) ("We therefore conclude that a reasonable jury, viewing the evidence in the light most favorable to Plaintiffs, could conclude that Ms. Rudnick did not assume the risk of her injuries by failing to avoid an open and obvious condition."); *Delvin v. Home Depot USA, Inc.*, 2013 WL 6835409 (M.D. Pa. Dec. 23, 2013) (denying motion for summary judgment, concluding that the hazard was not sufficiently known or obvious to a similarly situated reasonable man such that defendants are entitled to summary judgment); *Freeman v. Ruby Tuesdays, Inc.*, 2013 WL 4082235, at *4 (E.D. Pa. Aug. 12, 2013) ("whether the danger of spilled beef queso dip would have been similarly open and obvious to a reasonable person is a question of fact for the jury."); *Williams v. Woods Campground, Inc.*, 2009 WL 10685328, at *6 (M.D. Pa. Mar. 3, 2009) ("In considering the evidence in the light most favorable to the Plaintiff we find a genuine issue of fact exists as to whether the alleged defect in this case was open and obvious.").

Accordingly, viewing the facts and the inferences from those facts in the light most favorable to Plaintiff, reasonable minds could differ as to whether the amount of snow or ice in the parking lot was a dangerous condition and open and obvious. Further, even assuming *arguendo* that the condition in Defendants' parking lot was open and obvious, summary judgment still would not be warranted because a reasonable jury may conclude that Defendants should have anticipated the harm despite any knowledge of obviousness. *Knepp*, 2025 WL 660630, at *5; *see also Neyman v. Sunbelt Rentals, Inc.*, 759 F. Supp. 3d 608, 614 (W.D. Pa. 2024) ("Here, there are number of facts that could lead a jury to determine that Sunbelt could have anticipated Neyman's harm from the condition of the ramp. . . . A jury could reasonably determine not only that Sunbelt knew that the ramp was slippery, but that its slippery condition could lead to workers falling.").

For example, there is no evidence in the record that Defendants or their agents plowed, salted, and/or shoveled the particular parking lot on the day of Plaintiff's accident, and Defendants' Rule 30(b)(6) witness's testimony presented no knowledge as to whether any plowing, salting, and/or shoveling occurred. (Doc. 28-4 at 11:12-12:4, 13:17-14:10, 19:10-20:17, 21:23-23:3, 23:15-29:11, 30:24-33:22); *see also Snair*, 2021 WL 168329, at *3 ("Plaintiff also notes that Speedway employees were supposed to check for snow and ice around the pumps throughout the day, but that there is no evidence that any inspection occurred between the time the lot was plowed on December 12 and the time of the accident on December 13."). Moreover, Plaintiff testified that it was dark in the parking lot and she

had difficult seeing, which finds support in the surveillance video of the accident submitted by Defendants. (Doc. 28-3 at 24:14-25; 26:25-27:6); (Def. Ex. C). Further, the Court cannot definitively tell from the surveillance video whether the Plaintiff slipped and fell on snow, ice, black ice, a combination of snow and ice, or something else. In sum, the Court finds that there are genuine disputes of material facts, and that Defendants have failed to meet its burden to demonstrate that summary should be entered in their favor. The Court will therefore deny Defendants' motion for summary judgment on the basis that it owed no duty to Plaintiff because the snowy and icy conditions in the parking lot were open and obvious as matter of law.

### C. Hills & Ridges Doctrine

Defendant further seek summary judgment pursuant to Pennsylvania's "hills and ridges" doctrine. (Doc. 25 at 16-20). In opposition, Plaintiff argues that the doctrine has no application here, because the evidence shows it stopped snowing approximately eleven hours before Plaintiff's fall and therefore it was not virtually impossible for Defendants to clear and/or prevent the accumulation of snow and ice. (Doc. 28 at 26-29).

"Pennsylvania law does not impose an absolute duty on property owners to keep their premises completely free of snow and ice at all times." *Sprinkle v. AMZ Mfg. Corp.*, 2013 WL 2338488, at *2 (M.D. Pa. May 29, 2013) (citing *Rinaldi v. Levine*, 406 Pa. 74, 78, 176 A.2d 623 (1962)). The hills and ridges doctrine "is a long standing and well entrenched legal principle that protects an owner or occupier of land from liability for generally slippery

conditions resulting from ice and snow where the owner has not permitted the ice and snow

to unreasonably accumulate in ridges or elevations." *Morin v. Traveler's Rest Motel, Inc.*,

704 A.2d 1085, 1087 (Pa. Super. 1997); *see also Collins v. Philadelphia Suburban Dev.*

*Corp.*, 179 A.3d 69, 74 (Pa. Super. 2018) ("The hills and ridges doctrine, as defined and

applied by the courts of Pennsylvania, is a refinement or clarification of the duty owed by a

possessor of land and is applicable to a single type of dangerous condition, *i.e.*, ice and

snow.") (internal citation and quotation marks omitted).

"There is no absolute duty on the part of a landowner to keep him premises and

sidewalks free from snow and ice at all times.  These formations are natural phenomena

incidental to our climate." *Rinaldi*, 406 Pa. at 78 (internal citation and quotation marks

omitted).  "Snow and ice upon a pavement create merely transient danger and the only duty

upon the property owner or tenant is to act within a reasonable time after notice to remove it

when it is in a dangerous condition." *Id.*  "There is no liability created by a general slippery

condition on sidewalks.  It must appear that there were dangerous conditions due to ridges

or elevations which were allowed to remain for an unreasonable length of time, or were

created by defendant's antecedent negligence." *Id.*

"Where a property owner is charged with negligence in permitting the accumulation

of snow or ice on his sidewalk, the proof necessary to sustain such charge has been clearly

defined by our decisional law.  It is incumbent upon a plaintiff in such a situation to prove:

(1) that snow and ice had accumulated on the sidewalk in ridges or elevations of such size

and character as to unreasonably obstruct travel and constitute a danger to pedestrians travelling thereon; (2) that the property owner had notice, either actual or constructive, of the existence of such condition; (3) that it was the dangerous accumulation of snow and ice which caused the plaintiff to fall." *Id.* at 78-79. "Absent proof of *all* such facts, plaintiff has no basis for recovery." *Id.* (emphasis in original). "Moreover, the burden is upon the plaintiff to prove not only that there was an accumulation of snow and ice on the sidewalk but that such accumulation, whether in the form of ridges or other elevations, was of such size and character to constitute a substantial obstruction to travel." *Id.* at 79.

"The hills and ridges doctrine requires that an owner or occupier of land, after notice of a dangerous condition of hills and ridges of natural accumulations of snow or ice, act within a reasonable amount of time to eliminate the dangerous condition." *Collins*, 179 A.3d at 75. "Moreover, under prevailing law, a landowner has no obligation to correct the conditions until a reasonable time after the winter storm has ended." *Id.* "The hills and ridges doctrine applies with equal force to both public and private spaces." *Morin*, 704 A.2d at 1088. A "prerequisite to the application of the hills and ridges doctrine is a finding of a generally slippery conditions as opposed to isolated icy patches." *Id.*

"The doctrine's liability shield is predicated on the assumption that ice and snow are a natural phenomena incidental to our climate, and that to require that one's walks be always free of ice and snow would be to impose an impossible burden in view of the climatic conditions of this hemisphere." *Sprinkle*, 2013 WL 2338488, at * 3 (internal citation and

quotation marks omitted). "Hence, the hills and ridges doctrine casts its protection only in cases where the snow and ice at issue are the result of an entirely natural accumulation following a recent snowfall." *Id.* "The doctrine does not apply where the hazard is localized patch of ice, rather than the result of generally slippery conditions prevailing in the community. Nor does it apply when the icy condition is of artificial origin caused by the defendant's neglect." *Id.*; *see also Tonik v. Apex Garages, Inc.*, 442 Pa. 373, 376, 275 A.2d 296 (1971) ("Proof of 'hills and ridges' is necessary only when it appears that the accident occurred at a time when general slippery conditions prevailed in the community, which is not the case here. Where, as here, a specific, localized patch of ice exists on a sidewalk otherwise free of ice and snow, the existence of 'hills and ridges' need not be established.").

Here, the Court cannot say, as a matter of law, that the hill and ridges doctrine applies to preclude Plaintiff's recovery. There exists genuine dispute of material facts as to whether the conditions in the parking lot warrant the application of the hills and ridges doctrine. Although Defendants claim the undisputed facts demonstrate the doctrine applies to preclude recovery, there is a genuine dispute of material fact as to whether the conditions in the parking lot warrant the application of the doctrine. *See Sprinkle*, 2013 WL 2338488, at * 3 ("The doctrine does not apply where the hazard is a localized patch of ice, rather than the result of generally slippery conditions prevailing in the community. Nor does it apply when the icy condition is of artificial origin caused by the defendant's neglect.").

Similarly, there is a genuine dispute of material fact as to whether the Defendants acted within a reasonable time following the snowstorm and ice accumulation. According to Plaintiff, the winter storm advisory ended 11 hours before the accident and thus there was a sufficient period of time to clear the parking lots, while Defendants note that the accumulation did not stop until approximately 6 hours before the accident. (Doc. 28-2). These disputes of material facts regarding the application of the 'hills and ridges' doctrine preclude granting summary judgment to the Defendants. *See Markowski v. Sordoni Constr. Servs., Inc.*, 2015 WL 12425470 (M.D. Pa. Nov. 25, 2015) (denying motion for summary judgment based on 'hills and ridges; doctrine); *see also Sprinkle*, 2013 WL 2338488, at *5 ("Nevertheless, the ambiguity in the record evidence as to the condition of the accumulations, and the extent to which defendants intervened to remove any accumulation, raise genuine questions of material fact, which preclude the court from answering the threshold issue of whether hill and ridges doctrine applies."); *Sarver v. Sherwin Williams Co.*, 2013 WL 3939539, at *5 (E.D. Pa. July 31, 2013) (same); *Comer v. Boro Developers, Inc.*, 2010 WL 1948328, at *4 (E.D. Pa. May 14, 2010) ("[W]e conclude that a genuine issue of material facts exists as to whether the 'hills and ridges' doctrine applies in this case."); *Eikey v. Emerald Coal Res., L.P.*, 2006 WL 3524452 (W.D. Pa. Dec. 6, 2006) (same); *Galganske v. Elk Mountain Ski Ctr., Inc.*, 2006 WL 8448334 (M.D. Pa. Feb. 27, 2006) (denying motion for summary judgment based on the application of the hills and ridges doctrine). Accordingly, Defendants' motion for summary judgment will be denied because

the Court cannot say, as a matter of law, that the hills and ridges applies to preclude Plaintiff's negligence claim against the Defendants.

## V.      CONCLUSION

For the foregoing reasons, Defendants' motion in limine seeking to preclude the report and testimony of Plaintiff's expert Keith A. Bergman, P.E. will be denied without prejudice, subject to renewal prior to trial.  Defendants' motion for summary judgment will be denied. A separate Order follows.

Robert D. Mariani
United States District Judge