IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NATASHA WALKOWICZ SHEA, :
 :
   Plaintiff, : 3:23-CV-814
 : (JUDGE MARIANI)
  v. :
 :
KALAHARI RESORTS & :
CONVENTIONS - POCONOS, and :
KALAHARI RESORTS PA, LLC, and :
KALAHARI RESORTS, LLC, :
 :
   Defendants. :

## MEMORANDUM OPINION

Before the Court is Defendants' motion in limine. (Doc. 48). In its motion,

Defendants seek to preclude Plaintiff Natasha Walkowicz Shea from offering any testimony

from her economic loss experts John W. Dieckman, MS, CRC, CDMC and Andrew C.

Verzilli, MBA. (Doc. 48 at 2-5). Plaintiff opposes Defendants' motion. (Doc. 50). On

February 18, 2026, the Court held a *Daubert* hearing to address the pending motion. For

the reasons that follow, Defendants' motion will be granted in part and denied in part.

## I. FACTUAL BACKGROUND

In the motion, Defendants claim that both of Plaintiff's economic loss experts'

testimony relies entirely on speculation and hearsay and is therefore inadmissible.

Specifically, "nowhere in either expert's report is there an indication that any independent

investigation or analysis was performed by either expert with regard to verifying the

speculative statement made by Plaintiff that her fall was the cause of her employer school district not renewing her contract. Therefore, based upon the facts presented and the law in this matter, the economic testimony as to alleged future loss of earnings and loss of earnings capacity should be precluded." (Doc. 48 at 2-5). In contrast, Plaintiff claims that Mr. Dieckman's and Mr. Verzilli opinions are not speculative. Rather, Plaintiff asserts that the opinions are admissible under the liberal *Daubert* standard and are relevant to Plaintiff's claim of damages under Pennsylvania law. (Doc. 50 at 5-10).

## Expert Report of John W. Dieckman

In his report, Mr. Dieckman, a vocationalist, purports to "provide an opinion regarding the vocational prospects and the economic loss suffered by Dr. Shea because of injuries sustained in medical malpractice accident."[1] (Doc. 50-3 at 2). "For purposes of this assessment I reviewed several medical and related reports, cited below. I was also able to conduct an interview and assessment with Dr. Shea. The interview took place by Zoom on 8/13/24. I followed up with her by phone on 10/15//23 [sic] to update information regarding her employment and medical condition." (*Id.*).

In addition, Mr. Dieckman reviewed the following records: (1) the complaint; (2) St. Anthony Community Hospital, emergency room records; (3) MRI spine, 12/29/23; (4) medical records from several physicians; (5) the independent medical examination of Dr.

---

[1]    Contrary to Mr. Dieckman's assertions, this is a premises liability case, not a medical malpractice case. At the *Daubert* hearing, Mr. Dieckman recognized and corrected this descriptive error.

Nirav Shah; (6) Dr. Shea's CV and tax returns from 2022-23; (7) Port Jervis City School District documents, including a PTO summary for Dr. Shea, the employee agreement for Dr. Shea, and administrative evaluations for Dr. Shea from 2022-2023 and 2023-24; (8) pension estimate for Dr. Shea, retiring in 2030; and (9) a paystub of Natasha Shea dated 8/2/24. (*Id.* at 6).

Mr. Dieckman set forth his conclusions as follows:

Natasha Shea was injured in a slip and fall accident on 3/11/23. As a result of this injury, she had difficulty completing tasks of her position as Assistant Superintended for Instruction for Port Jervis City School District.

It is the opinion of Dr. Shah that these injuries are permanent and that they will reduce her expected work life.

She is currently under contract for an additional 2 years. Her contract has not been renewed and her expectation is that she will lose this position within 2 years.

Two alternatives regarding future wage loss are presented. The first is the difference in pension between completion of 25 years of service versus 30 years of service, which is full pension. That will result in annual loss of pension calculated at $66,625. Over her remaining lifetime, this loss is calculated at $1,753,570.

An alternative considers that she will be unable to continue in her current role beyond 2 years and will be forced to find alternative employment. In this alternative scenario, she will suffer an annual loss of earnings calculated at $96,695. Over 16.12 years of expected work life, her losses in this scenario are calculated at $1,558,723.

*It is my professional opinion that Natasha Shea, as a result of the slip and fall accident on 3/11/23, will suffer a loss of future earnings capacity between $1,558,723 and $1,753,570.*

(*Id.* at 12-13) (emphasis in original).

## Expert Report of Andrew Verzilli

Mr. Verzilli has an MBA and is being offered as an expert in economics and intends to testify regarding Plaintiff's lost earnings capacity. According to Mr. Verzilli's report, he reviewed: (1) the complaint; (2) Mr. Dieckman's vocational report; (3) 2023 Income Tax Return; (4) Employment Agreement of 7/18/24; (5) Pension Benefits Profile from NYSTRS; (6) NYSTRS Pension estimates; (7) Dr. Shah's expert medical report; (8) the deposition of plaintiff; and (9) "various publications/source documents (as cited)." (Doc. 50-4 at 1). Mr. Verzilli will opine that Plaintiff's estimated loss in earnings capacity ranges from $1,610,523 to $2,144,953. (Doc. 50-4 at 5). Defendants' principal issue with the testimony of Mr. Verzilli is that such testimony is speculative because it wrongly relies on Mr. Dieckman's vocational report. (Doc. 48).

## II.    ANALYSIS

Federal Rule of Evidence 702 governs the admissibility of expert witnesses. It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

4

"Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli R.R Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994)). Rule 702 has a "liberal policy of admissibility." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (internal citation and quotation marks omitted). Accordingly, the "rejection of expert testimony is the exception and not the rule." *Dorman Prods. v. PACCAR, Inc.*, 201 F. Supp. 3d 663, 686 (E.D. Pa. 2016). The party offering the expert must prove each of these requirements by a preponderance of the evidence. *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999); *accord* Fed. R. Evid. 702.

## A. **Qualification of Plaintiff's Economic Loss Experts**.

"Qualifications refers to the requirement that the witness possess specialized expertise." *Schneider ex. Rel. Estate of Schneider*, 320 F.3d at 404. To qualify as an expert, Rule 702 requires the witness to have "specialized knowledge regarding the area of testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002). The Third Circuit has instructed district courts to interpret the qualification requirement "liberally" and not to insist on a particular kind of degree or background when evaluating the qualifications of an expert. *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998); *see also Pineda*, 520 F.3d at 244 ("We have interpreted Rule 702's qualification requirement liberally.").

5

Mr. Dieckman has been a licensed vocationalist since 1983. He has been qualified as an expert vocationalist numerous times in both state and federal courts. Hr'g Tr. at 29:16-32:1. Mr. Verzilli is an economist who holds an MBA and has also been qualified as an economics expert in both state and federal court. Hr'g Tr. at 21:16-22:23; 67:17-68:3. Based on the testimony at the *Daubert* hearing, the Court finds that both Mr. Dieckman and Mr. Verzilli satisfy Rule 702's liberal qualification standards and are therefore qualified to offer their opinions in this case, with the limitations on Mr. Dieckman's testimony as stated later herein.

## B. Reliability of Plaintiff's Economic Loss Experts.

An expert's testimony is reliable if it "is based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Schneider ex rel. Estate of Schneider*, 320 F.3d at 404 (internal citation and quotation marks omitted). "Yet admissibility is not based on whether an expert's opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research. Rather, the court looks to whether the expert's testimony is supported by good grounds." *UGI Sunbury, LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020) (internal citation and quotation marks omitted). "This inquiry applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *Cohen v. Cohen*, 125 F.4th 454, 462 (3d Cir. 2025) (internal citation and quotation marks omitted).

To determine whether the expert's testimony is supported by "good grounds," *Daubert's* reliability analysis requires a court to consider, among other things: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the methods have been put." *In re Paoli*, 35 F.3d at 742 n.8. "However, *Daubert* did not set out a definitive checklist or test, and no single factor was deemed dispositive." *Mercurio v. Louisville Ladder, Inc.*, 2018 WL 4088059, at *4 (M.D. Pa. Aug. 27, 2018) (citing *Daubert*, 509 U.S. at 593). "While a litigant has to make more than a prima facie showing that his expert's methodology is reliable" the Third Circuit has "cautioned that the evidentiary requirement of reliability is lower than the merits standard of correctness." *Pineda*, 520 F.3d at 247 (internal citation and quotation marks omitted). The *Daubert* standard "is not intended to be a high one, nor is it to be applied in a manner that requires the plaintiffs to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessment of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (internal citation and quotation marks omitted).

7

The Court finds that the opinions of Mr. Dieckman, as limited herein, and Mr. Verzilli are reliable based on the preponderance of the evidence presented at the *Daubert* hearings. Both relied on generally accepted principles in their respective fields. For Mr. Dieckman, the Court finds his methodology to be reliable and based upon "good grounds." At the *Daubert* hearing, Mr. Dieckman testified as follows:

Q: I just asked very simply, what are factors you use as a vocational expert when determining loss of earnings capacity?

A: Okay, yes. My methodology is the same when I'm doing evaluations for individuals both in workers' comp and for personal injury. First of all, I review documentation, mostly medical documentation related to someone's level of disability. Whenever there is financial information, tax returns, pay stubs, whatever, that's also important to me. In this particular case, I had an opportunity to review a contract and a pension agreement for Dr. Shea. So that's relevant financial information. After that, I will do an interview. And my interview will basically attempt to gather some logistical information, where someone lives, how they access transportation, et cetera, to confirm some medical information, and then get some educational vocational information, basically to understand what someone's particular work history is as well as their current employment. And then after that, I will offer an opinion regarding someone's alternate employability. If they cannot do the one job, what other kinds of positions might they be able to do? What other

kinds of earnings might they be able to do?  And then what is the wage loss that's associated with a change in career.

Q:  And are those generally accepted things in your field as a vocational specialist?

A:  Very much so, yes.

Q:  Okay.  And when you did your—you offered your report for Dr. Shea, did you use your standard and customary methods that you used in other cases, both forensic and non-forensic?

A:  Yes, positively.

Q:  Okay.  So one thing you relied on in your report was the medical documentation, including the expert report for Dr. Nirav Shah which talked about reasonable and necessary occupation adjustments, time off work, and reduced life expectancy.  Is relying on medical experts and their reports something you do as a vocational expert?

A:  It is a necessity in my field.  I need, obviously, to have a medical opinion regarding limitations and any prognosis for improvement or lack of improvement in the future.  So I need to rely upon something like Dr. Shah in this particular case.  I quote his report liberally in my evaluation because his opinion really forms the basis of my opinions as well.

Q:  Okay.  And in addition to relying on medical reports, is it usual and customary thing for you to interview the person who—you know, to determine whether or not

you believe, from a vocational perspective, that they have a loss of earnings

capacity?

A:  Yes.  I always interview a person, unless there is some particular circumstances

where I'm only asked to do a review of records.  That's very rare.  I've literally

interviewed hundreds and hundreds of individuals over the years regarding their own

particular employment situation and, ultimately, their loss of earnings.

Hr'g Tr. at 32:8-34:11; *see also* 34:12-40:10 (discussing methodology).

Mr. Dieckman also testified that the opinions he intends to offer are generally accepted in

his field and are based on a reasonable degree of professional certainty.  *Id.* at 40:6-10.

For Mr. Verzilli, the Court finds his methodology reliable and generally accepted with

the economics community and his testimony is supported by "goods grounds."  At the

*Daubert* hearing, Mr. Verzilli testified as follows:

Q:  Okay.  Can you tell us about any relevant experience—you know, just in terms of

performing evaluations of loss of future earnings capacity, can you just tell us what

are the relevant factors that are taken into account?

A:  It would be the background of the individual, their age, education, employment,

earnings history, those relevant facts.  Then we also have to look at the labor market

and economic data.  There are times, such as here, I have to rely upon a vocational

opinion such as Mr. Dieckman who is providing an opinion that's not in my area of

economics, so in terms of assuming that this injury's going to affect what work she

can do or if someone has to retire early.  And then after we do all that, we're basically doing math.

Hr'g Tr. at 68:4-17.

Q:  Okay.  Now, you also mentioned looking at tax returns, an employment agreement, pension benefits, and pension estimates.  Are these documents that you would generally—that you would generally rely on in determining somebody's loss of future earnings?

A:  Yes, I would look at the tax returns, an employment agreement—here, we have the New York teacher's pension; and there was information from the pension system, and as well as Dr. Shea's deposition.

Q:  Okay.  And are these things—are these items that would be generally accepted to be relied upon by people in your field?

A:  Yes.

Hr'g Tr. at 69:11-23.

Q:  Okay.  Now, can you explain how you did your calculation of pre-injury versus post-injury earning capacity and how this, you know—and, you know, sort of how you got to the conclusions you have?

A:  Sure.  In terms of Dr. Shea's pre-injury earnings capacity, I based it on her current salary with Port Jervis City School District of $200,000 a year.  That was her pre-injury earnings capacity.  In terms of post-injury, I did—I did two, one as early

retirement.  So I assumed she would continue working in that job until age 55 and retire five years earlier than going to age 60.  So in that instance, there was no loss of earnings capacity until we assumed she would leave the labor market.  My second alternative would be at the end of this school year, as of the end of June of 2026, she would—her present employment would end, and she would have alternative earnings capacity of about $97,000 a year.  And so that's was the two post-injury alternatives.

Q:  All right.  And are those—and then those calculation you came to, they are based on reliable methods?

A:  Yes, they are.

Q:  Okay.  Are they standardly used by economist such as yourself in calculating future lost earnings potential?

A:  All the time.  Loss of earnings capacity is, what is the person's pre-injury potential had this event not occurred and comparing that to their post-injury earnings capacity.  So it's two income steams.  And you subtract the post-injury from the pre-injury.  And that gives you the loss of earnings capacity.

Hr'g Tr. at 70:18-71:21.

## C. Whether the Proposed Expert's Testimony Fits the Case

The expert's testimony must also "'fit,' in that it must assist the trier of fact." *Oddi*, 234 F.3d at 145.  "To determine whether an expert's testimony fits the proceedings, this

Court asks whether it will help the trier of fact to understand the evidence or to determine a fact in issue." *UGI Sunbury*, 949 F.3d at 835. In other words, "the expert's testimony must be relevant for the purpose of the case and must assist the trier of fact." *Schneider ex. Rel Schneider*, 320 F.3d at 405; *see also Cohen*, 125 F.4th at 464 (fit "goes primarily to relevance"). "Fit is not always obvious, and scientific validity for one purpose is not necessary scientific validity for other, unrelated purposes." *UGI Sunbury*, 949 F.3d at 835.

## **Specific Opinions Offered by Mr. Dieckman**

Mr. Dieckman is a vocationalist has been both accepted as an expert by numerous courts. He intends to testify regarding the future economic losses suffered by Plaintiff as a result of her fall. In his report, he relies on the opinion of Dr. Shah as to permanence of Plaintiff's injury. He also relies on his interview with Plaintiff, who informed him that her contract was not renewed because of the fall.[2]

Pennsylvania law "'does not require that proof in support of claims for damages or in support of compensation must conform to the standard of mathematical exactness.'" *Kaczkowski v. Boulbasz*, 491 Pa. 561, 567, 421 A.2d 1027 (1980) (quoting *Lach v. Fleth*, 361 Pa. 340, 352, 64 A.2d 821 (1949)). Instead, all the "law requires is that a claim for damages must be supported by a reasonable basis for calculation: mere guess or speculation is not enough." *Id.* (internal citation and quotation marks omitted). "If the facts

---

[2]    As explained, *infra* at 15-16, Mr. Dieckman will be precluded from testifying as to what Plaintiff told him in regard to the non-renewal of her contract with the Port Jervis City School District, i.e., that it was not renewed because of injuries she sustained in the slip and fall incident at issue in this case.

afford a reasonably fair basis for calculating how much plaintiff's entitled to, such evidence cannot be regarded as legally insufficient to support a claim for compensation." *Id.*

"An individual's future earning capacity is capable of estimation based upon objective factors of age, maturity, education and skill. A determination of an individual's future earning capacity based on objective criteria is far less speculative than most other estimates made by the trier of fact." *Id.* at 574. "Admittedly, predicting lost future earnings entails some degree of speculation. However, that alone does not justify excluding reliable economic evidence since imprecision is inherent in any computation of lost future benefit. In view of our acceptance of the reliability of the science of economics, the victim's lost future earning capacity should be treated like any other question of fact and should be submitted to the trier of fact after proper foundation and expert testimony." *Id.*

"To recover for the loss of wages, a plaintiff must establish a wage loss that is the result of the negligence of the defendant. With respect to impairment of earnings capacity, the law requires only proof that the injured person's economic horizons have been shortened as a result of the of the tortfeasor's negligence." *Mader v. Duquesne Light Co.*, 199 A.3d 1258, 1267 (Pa. Super. 2018). "The consideration of loss of earning capacity is not solely the comparative amount of money earned before or after an injury. The true test is whether or not there is a loss of earning power, and of ability to earn money. An award of damages for lost future earnings capacity must be supported by evidence linking the

plaintiff's injuries to loss of earnings capacity." *Id.* "It is for the jury to decide the extent and duration of the loss." *Fish v. Gosnell*, 463 A.2d 1042, 1051 (Pa. Super. 1983).

Defendants' principal issue with Mr. Dieckman's testimony is that he relied upon his interview of Plaintiff in order to opine that Plaintiff's contract was not renewed because of the accident. Whether Plaintiff's contract was or was not renewed, and whether that renewal (or lack thereof) was caused by Plaintiff's injuries due to the slip and fall are disputed facts. "An expert is, nonetheless, permitted to base his opinions on a particular version of disputed facts and the weight to be accorded to that opinion is for the jury." *Walker v. Gordon*, 46 Fed. App'x 691, 695-96 (3d Cir. 2002). It is also a proper subject of cross-examination at trial. *See id.* at 696 ("Again, factual disputes are for the jury, and Walker was perfectly free to explore on cross-examination the reliance placed by [expert] on the disputed facts and to argue to the jury that, if it rejected the underlying factual premises of his report, it should also reject [expert's] expert opinion.").

In sum, the Court will deny Defendants' motion and permit Mr. Dieckman to offer his opinions regarding Plaintiff's future loss earnings capacity (i.e., shortened "economic horizons") because he is qualified to offer those opinions, those opinions are reliable, and they fit with this case. At trial, Defendants will be able to cross-examine Mr. Dieckman to highlight certain assumptions he relied on in forming his opinion in an attempt to undermine his credibility. Mr. Dieckman, however, will be precluded from testifying as to any statements made to him by the Plaintiff wherein she informed him that the non-renewal of

her contract of employment with the Port Jervis City School District was caused by, or the result of, injuries sustained by Plaintiff as a result of a slip and fall on the premises of the Defendants. The introduction of any such statements through Mr. Dieckman presents inadmissible hearsay and their probative value does not substantially outweigh their prejudicial effect. Fed. R. Evid. 703; *see also United States v. Gilmore*, 837 Fed. App'x 101, 104-05 (3d Cir. 2020); *United States v. Lane*, 2025 WL 3229509, at *1-2 (3d Cir. Nov. 19, 2025); *Langbord v. United States Dept. of Treasury*, 832 F.3d 170, 194-96 (3d Cir. 2016) As to other objections raised by the Defendants, the Court will entertain objections to Mr. Dieckman's testimony on a question-by-question basis at trial.

### *Specific Opinions Offered by Mr. Verzilli*

Similarly, the Court will not preclude the testimony of Mr. Verzilli. He is qualified to offer those opinions, his opinions are reliable, and they fit with this case and are relevant. *See Dougherty v. Sch. Dist. of Philadelphia*, 2015 WL 2365600, at *9 n.1 (E.D. Pa. May 18, 2025) (denying motion in limine seeking to preclude Mr. Verzilli from testifying). Moreover, the methodology used by Mr. Verzilli in calculating Plaintiff's future lost earning capacity is a well-accepted methodology in the fields of economics, which Defendants do not dispute. Therefore, Mr. Verzilli will be permitted to testify at trial. Like Mr. Dieckman, many of Defendants' issues with his testimony go to weight, not admissibility. At trial, Defendants will be able to cross-examine Mr. Verzilli to highlight certain assumptions he relied on in forming his opinion in an attempt to undermine his credibility. As to other objections raised

16

by the Defendants, the Court will entertain objections to Mr. Verzilli's testimony on a question-by-question basis at trial.

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion in limine will be granted in part and denied in part.  A separate Order follows.

Robert D. Mariani
United States District Judge